## The People v. John Doe.

A challenge to the array must be in writing.

The defendant, on being arraigned in the county court on an indictment for murder, requested to be tried before the circuit judge, under the provisions of sec. 7 of the act to regulate and define the jurisdiction of the circuit and county courts. Sess. L. 1848, p. 237. On the day appointed for the commencement of the next regular term of the circuit court, the circuit judge did not appear, and his absence was noted on the journal by the clerk, and the court adjourned to the next day, when the circuit judge appeared and assigned a day for the trial of the cause. It was held, that the statute requiring the assignment to be

The People *v.* John Doe.

made on the first day of term was, as to time, directory only, and that the assignment made on the second day of term was good within the statute.

An order made under the act, Sess. L. 1848, p. 237, by the county judge for summoning a jury to try a cause before the circuit judge, more than three days before the day assigned for the trial, is in compliance with the letter and spirit of the act.

The most usual mode of trying the impartiality of a juror, challenged for favor, is by triers appointed for that purpose, on the demand of the challenging party, but it is not the only legal mode.

Where a juror is challenged for favor, and the challenging party, when asked by the court how he will have the challenge tried, refuses to indicate the mode of trial, it may be tried by the court by administering an oath to the juror, and propounding questions to him.

If a party or his counsel interpose a challenge for favor, or raise any other preliminary question involving an inquiry, and then neglects or refuses to move the trial or examination thereof, he thereby waives such challenge or question.

The degree of force, or the means to be employed, in protecting one's person or personal liberty, must depend on circumstances. To justify a person in taking the life of another, it must appear his safety required him to do so.

On an indictment for murder generally, as at common law, the prisoner may be found guilty of murder in the second degree, under R. S. ch. 153, p. 658.

ERROR to St. Joseph Circuit Court. Indictment for murder.

*Lothrop*, attorney general, for the people.

*Chipman*, for the defendant.

*By the court*, GREEN, J. The defendant was indicted in the St. Joseph county court, in December, 1848, for the crime of murder in the first degree. Being a stranger, and his name being unknown to the jurors, he was indicted by the fictitious name of "John Doe," and also by a description of his person. On being arraigned, he pleaded not guilty, and requested to be tried before the circuit judge, pursuant to the provisions of section 7 of "An act to regulate and define the jurisdiction of the circuit and county courts," Sess. L. 1848, pp. 237, 238. This request was duly noted by the clerk of the circuit court upon his docket. On the day appointed for the commencement of the next regular term of the circuit court for St. Joseph county, the circuit judge did not appear in said court, and his absence was duly noted upon

The People *v.* John Doe.

the journal by the clerk, and the court adjourned to the next day, when the circuit judge appeared and assigned the 27th day of December, 1848, for the trial of the cause, and notified the county judge and prosecuting attorney thereof. *More* than three days before that assigned for the trial, the county judge made an order for the summoning of a petit jury for the trial of the cause. On the day assigned for the trial, and when the petit jury were about to be called for that purpose, the counsel for the prisoner challenged the array, and assigned the following causes, viz:

" 1. That the order naming a day for the trial of said indictment, was not made by the circuit judge until the second day of the term, as appears by the journal.

" 2. The county judge did not make the order for the jury to try the cause, three days previous to the day named for trial."

Another cause was assigned, which was abandoned upon the argument.

It is a sufficient answer to this challenge, that it was not made in writing, but orally, and was not reduced to writing in any form until after it was overruled by the court, when the alleged causes of challenge were allowed to be entered upon the journal, at the request of prisoner's counsel.   1 Chitty's Cr. L. 546.

But I am of opinion, that the objections assigned could not prevail in any form. The statute requiring the circuit judge to assign a day for the trial, is clearly directory so far as *time* is concerned, and in case of his refusal to assign a day, the supreme court, upon a proper application, would undoubtedly compel him to assign a day, even after the first regular term subsequent to the request of the defendant had gone by.

The order for summoning a petit jury having been made *more* than three days before that assigned for the trial, the statute was in that respect fully complied with, according to its letter and spirit.

The next question arising upon the bill of exceptions grows out of the following proceedings:

" Lewis Miller having been called as a juror by the clerk, the counsel for the prisoner rose and remarked that he challenged the juror *for favor.* The court desired the clerk to administer the usual oath to the juror, whereupon the counsel for the prisoner objected. The court

then requested the counsel for the prisoner to indicate what course he desired to be pursued to test the validity of the challenge. The counsel for the prisoner said he had no suggestion to make, that he left the court to adopt its own course—insisting upon his objection. The court having caused the usual oath to be administered to the juror, stated to the counsel for the prisoner that he could propound such questions to the juror as he might deem proper. The counsel for the prisoner declined assigning any cause of challenge, except as aforesaid. The counsel for the prisoner was asked if he desired *triers*, but he declined saying whether he would or would not." The counsel for the prisoner excepted to the ruling of the court.

"A challenge to *the favor* was understood and admitted to be made as to the remaining jurors—same disposition of question."

The counsel for the prisoner insists, that upon his challenging the jurors for favor, it became the duty of the court, on its own motion, to appoint triers, and that the court had no power to proceed upon the challenges in any other manner. In this the counsel is mistaken. The most usual mode of trying the impartiality of a juror challenged for favor, is by triers appointed for that purpose, on the demand of the challenging party; but this is not the only legal mode.

In the case of The People *v.* Rathbun, 21 Wendell 510, the jurors, on being challenged for favor, were sworn and examined, and their competency determined by the court; and this having been done without objection, the court subsequently refused triers when demanded, and it was held not to be error. See, also, 4 Wendell 229, The People *v.* Mather.

In this case, the court requested the counsel for the prisoner to indicate what course he desired to be pursued to test the validity of the challenge, and he replied that he had no suggestion to make, but that he left the court to adopt its own course—still insisting upon his objection. It does not appear, except by inference, to what the objection was made, but it seems to have been to the administering of the usual oath to the juror by the clerk.

The counsel for the prisoner appears, in this instance, to have entirely misconceived his own duty, as well as the power and duty of the court, and I think the court would have been entirely justifiable, under the circumstances of this case, in disregarding the challenge, if it were not

its imperative duty to do so. Of what does the party complain? Did the court deny any application or motion of the prisoner's counsel? No; but the counsel for the prisoner assumes that the court, by omitting to appoint triers, deprived the prisoner of a right. The answer is, that by not claiming the right, he waived it; and that it was expressly waived by leaving the court to adopt its own course. If a party or his counsel interpose a challenge for favor, or raise any other preliminary question involving an inquiry, and then fold his arms and neglect or refuse thereupon to move the trial or examination thereof, he thereby waives such challenge or question, and it is very clear that the court may properly disregard it.

On the trial, one E. H. Pride, a witness sworn on the part of the prosecution, testified that he was an acting justice of the peace of the township of Fawn River; that two men called at Toll's store in said township where witness was, one of whom was Hathaway, who resides there, and the other called himself a constable from Indiana. The counsel for the prisoner objected to the witness testifying to what he called himself, which objection was overruled, and the testimony admitted. The witness was then asked what they wanted him to do, and he was proceeding to say that they asked him to aid in arresting a man who had stolen a span of horses in Indiana, when the counsel for prisoner objected to the evidence: the court overruled the objection, and the evidence was received. To these rulings of the court the counsel for the prisoner excepted.

It appears further, from the bill of exceptions, that upon these objections being made, the court decided, that if the testimony was merely introductory, and necessary to explain other facts material to the issue, the testimony might be competent; and that the prosecutor thereupon stated to the court that such was its character, whereupon the objections were overruled.

The object of this testimony, in connection with other evidence given upon the trial, appears to have been, to show the character of the transaction which resulted in the death of Fanning. John C. Richmond, a witness subsequently introduced, testifies to a conversation which he had with the prisoner on the same day, and after his arrest, in which the prisoner confessed having stolen a span of horses, and stated, as a reason why he ran, that when the constable came, he knew

him, and knew what he was after. The testimony, taken together, showed that both the prisoner and those who were pursuing him, including Fanning, understood that they were only endeavoring to arrest the prisoner on account of a supposed theft committed by him, and that they were not pursuing him for the purpose of doing any violence to his person.

In this view of it, the testimony seems to have been properly received, though it did not appear that those making the attempt had any legal right to arrest the prisoner.

The prisoner was charged with murder in the first degree, and the testimony in question was very proper, as tending to show the *scienter.* See The People v. Rathburn, 21 Wendell 510; and The People v. Bodine, 1 Denio 283.

The charge of the court upon the specific instructions which the prisoner's counsel requested might be given by the court, was as favorable to the prisoner as he had a right to require. The court instructed the jury that " a person was authorized to defend his person or personal liberty to the extent claimed by the counsel for the prisoner; but that the degree of force, or the means to be employed in protecting his person or personal liberty, must depend upon circumstances: that to justify a person in taking the life of another, it must appear that his safety required him to do so: that in the case before the court, there was no evidence that the person or personal liberty of the prisoner had been assailed by the deceased when the wounds were inflicted upon him by the prisoner, which it is admitted by the prisoner proved fatal."

In the case of the Commonwealth v. Selfridge (Selfridge's Trial, p. 160), the principles of law relative to destroying life in self defence are very clearly and perspicuously laid down by Mr. Justice Parker. He says:

*First:* That a man who, in the lawful pursuit of his business, is attacked by another under circumstances which denote an intention to take away his life, or do him some enormous bodily harm, may lawfully kill the assailant, provided he use all the means in his power, otherwise, to save his own life or prevent the intended harm; such as retreating, as far as he can, or disabling his adversary without killing him, if it be in his power.

*Secondly:* When the attack upon him is so sudden, fierce and violent, that a retreat would not diminish, but increase his danger, he may instantly kill his adversary without retreating at all.

*Thirdly:* When from the nature of the attack, there is reasonable ground to believe that there is a design to destroy his life, or commit any felony upon his person, the killing of the assailant will be excusable homicide, although it should afterwards appear that no felony was intended.

By comparing this language, which expresses the well established and recognized doctrine on this subject, with that used by the Chief Justice in the case under consideration, it is very apparent that the prisoner had nothing to complain of in that respect.

But it is insisted that the last clause of the charge contains a statement not warranted by the evidence. Upon a careful examination of all that appears in the bill of exceptions, I cannot discover that it is not warranted.

As to the question of identity between the prisoner and the person who inflicted the mortal wounds upon Fanning, it is only necessary to remark, that so far as appears, all the witnesses who testified in relation to the infliction of the wounds, and the confession of the murder afterwards, identified the prisoner at the bar, and that no question of identity appears to have been made on the trial.

Finally, it was insisted on the argument, that inasmuch as the indictment was for murder generally, as at common law, and the jury found the prisoner guilty of murder in the second degree only, no judgment could be given upon the verdict.

That is precisely the form of indictment contemplated by our statute. R. S. ch. 153, p. 658. The statute does not undertake to define the crime of murder, but only to distinguish it into two degrees, for the purpose of graduating the punishment. This appears very evident from section three of the chapter referred to, which is as follows:

"The jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict, whether it be murder of the first or second degree; but if such person shall be convicted by confession, the court shall proceed by examination of witnesses to determine the degree of the crime, and shall render judgment accordingly."

If it were necessary to frame the indictment so as to charge murder of a particular degree, the section here quoted would be entirely nugatory.

Upon the whole, there does not appear to be any good ground for reversing the judgment upon the record, or granting a new trial upon the bill of exceptions.

*Judgment affirmed.*